IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SAMMY L. JOHNSON,                    )
                                     )
         Plaintiff,                  )
                                     )
                                     )      CIV-13-1333-HE
v.                                   )
                                     )
COMANCHE COUNTY BOARD OF             )
COUNTY COMMISSIONERS, et al.,        )
                                     )
         Defendants.                 )

REPORT  AND  RECOMMENDATION

Plaintiff, a state prisoner appearing *pro se* and *in forma pauperis*, brings this civil

rights action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional and federal

statutory rights. The matter has been referred to the undersigned Magistrate Judge for initial

proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Before the Court is the Motion and

Brief to Dismiss or in alternative for Summary Judgment filed by Defendant Comanche

County Board of County Commissioners ("Board") (Doc. # 26), to which Plaintiff has

responded (Doc. # 29). Defendant Board has replied to Plaintiff's Response (Doc. # 34).

Also before the Court is the Motion and Brief to Dismiss or in alternative for Summary

Judgment filed by Defendants Gossen, Hobbs, Nix, and Williams (Doc. # 27), to which

Plaintiff has responded (Doc. # 30). Defendants Gossen, Hobbs, Nix, and Williams have

replied to Plaintiff's Response (Doc. # 33). For the following reasons, it is recommended

that Defendants' Motions be granted.

1

## I. Standard of Review - Motion to Dismiss

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's . . . complaint alone is legally sufficient to state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to make his or her "claim for relief . . . plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). While "[t]echnical fact pleading is not required . . . the complaint must still provide enough factual allegations for a court to infer potential victory." Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008). If the allegations "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible." Robbins v. Oklahoma ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 570). Under this standard, the plaintiff's well-pleaded factual allegations are accepted as true and viewed in the light most favorable to the nonmoving party. Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).

## II. Standard of Review - Motion for Summary Judgment

Summary judgment may be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court reviews the evidence and inferences drawn from the record in the light most favorable to the nonmoving party. Burke v. Utah Transit Auth. & Local, 462 F.3d 1253, 1258 (10th Cir. 2006)(quotation omitted), cert.

denied, 550 U.S. 933 (2007). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are "facts which might affect the outcome of the suit under the governing law." Id. "At the summary judgment stage, a complainant cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." Burke, 462 U.S. at 1258 (internal quotation marks and citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quotations omitted).

III. Plaintiff's Claims

In his Complaint filed December 19, 2013, Plaintiff alleges that during the period of time he was detained in the Comanche County Detention Center ("CCDC") between May 6, 2013 and October 4, 2013, he was housed in CCDC's medical unit "because I was on crutches" as a result of a previous fracture in his right foot and because of his medical needs due to an open wound/infection on his heel. Plaintiff asserts that a "few days" after he was booked into the jail he was treated by a physician's assistant at the jail, Defendant Williams, who removed Plaintiff's soft cast, took photos of the wound on his right heel, gathered information from Plaintiff's treating doctor, had Plaintiff sign a consent form in order to obtain his medical records, and advised Plaintiff of the jail's plan to schedule appointments for Plaintiff at an outside medical facility for wound treatment.

In count one of the Complaint, Plaintiff alleges that he was denied rights under the Americans with Disabilities Act ("ADA"). Plaintiff alleges he had a qualifying disability and he was not allowed to participate in out-of-cell time or telephone access during his confinement in the jail's medical unit in the same manner as detainees in the general population area of the jail. Plaintiff alleges detainees in the general population area were allowed out-of-cell time for 14 hours per day and unlimited use of the telephone in their "day room." Plaintiff alleges that although the medical unit had "its own day room [with] TV, etc." he was "only allowed one hour recreation per day on rec yard and three phone calls per week for fifteen [to] thirty minutes." Plaintiff alleges that his request for access to out-of-cell time to the same degree as detainees in the general population unit was denied because he was "on crutches and it's aginst [sic] policy."

In count two of the Complaint, Plaintiff alleges that his rights under the ADA were violated due to the conditions of his confinement at the CCDC. Plaintiff alleges that until July 1, 2013, he had a cellmate who cleaned the cell in which he was confined but that after July 1, 2013, when the cellmate was transferred to another cell, he had no one to clean his cell, he was unable to clean his cell due to his medical condition, and that he advised "nurse Wanda" on July 3, 2013, that he was physically unable to clean his cell. He alleges another detainee was moved into his cell on that date and remained in the cell with Plaintiff until he was released from the jail's custody on July 18, 2013.

Plaintiff alleges that after this second cellmate left he attempted to clean his cell but advised "Nurse Gains" that he was physically unable to do so and that "Nurse Gains" advised

4

him that Ms. Nix "said for me to do what I can without hurting myself." Plaintiff alleges that on July 14, 2013, Defendant Nix denied his request to "appoint someone to clean cell." Plaintiff alleges that "[o]ver the next two months [his] cell got so filthy that [he] got athlete's foot and jock itch." He alleges that he occasionally had cellmates but they "were moved before cleaning day (Wednesday)" and his cell was not cleaned from July 18, 2013, until he left the jail on October 4, 2013.

In count three of the Complaint, Plaintiff alleges Defendants retaliated against him for filing a grievance and denied him his constitutional right of access to the courts. However, in his responsive pleadings (Doc. # 29 and Doc. # 30), Plaintiff seeks to amend the Complaint in order to voluntarily dismiss this claim. Plaintiff's request to amend the Complaint to dismiss count three is GRANTED.

In count four, Plaintiff asserts that jail officials were deliberately indifferent to his serious medical needs and discriminated against him due to his indigence when he was denied "emergency dental care because [the jail] has a policy/custom that does not allow [the jail] to provide emergency dental care to those detainees who are indigent and cannot afford up front dental cost." Plaintiff alleges he requested access to a dentist on August 13, 2013, to treat two "abcess[es] [sic]" in his mouth. He alleges he was treated by the jail's physician's assistant, Defendant Williams, on August 15, 2013, who prescribed pain medication and deadened the area in Plaintiff's mouth with Novocaine. He alleges that he requested to see a dentist "to have the problematic teeth pulled" but he was advised by Defendant Williams that "their facility does not send anyone to dentist unless they have the

money . . . to pay for appointment/dental services or their family make[s] payment with dentist . . . .".

Plaintiff alleges he was given over-the-counter pain medication by medical staff at the jail on two occasions and that he was again treated by Defendant Williams on August 27, 2013, and that Defendant Williams prescribed antibiotic medication for Plaintiff's dental problem but refused to send him to a dentist. He admits he received antibiotic and pain medication but alleges that the medications did not cure the "abcess [sic]." Plaintiff alleges he submitted a request to staff to Defendant Nix on September 15, 2013, asking to see a dentist for his toothache. She responded that the jail could schedule an appointment with a dentist but the cost of the treatment would be added to Plaintiff's account. Plaintiff alleges he asked for the appointment to be scheduled but was advised by Defendant Nix to first see the physician's assistant, Defendant Williams, for a check-up to determine whether an infection was present. He alleges this was a "stall tactic" and the following week he was transferred to the custody of the Oklahoma Department of Corrections.

IV. Counts one and two -  ADA Claims

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Gossen, Hobbs, Nix, Williams, and Board seek the dismissal of Plaintiff's claims against them in counts one and two under the ADA for failure to state a claim upon which relief may be granted. Alternatively, the Defendants seeks summary judgment concerning Plaintiff's ADA claims in counts one and two.

Title II of the ADA prohibits any public entity from discriminating against "qualified"

persons with disabilities in the provision or operation of public "services, programs, or activities." 42 U.S.C. § 12132. Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, . . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). When these requirements are met, in Title II "Congress require[s] the States to take reasonable measures to remove architectural and other barriers to accessibility." Tennessee v. Lane, 541 U.S. 509, 531 (2004)(citing 42 U.S.C. §12131(2)).

The Act defines the term "public entity" to include state and local governments, as well as their agencies and instrumentalities. 42 U.S.C. § 12131(1). Thus, Title II of the ADA applies to the "services, programs, or activities" provided by state and local governments. The Supreme Court has held that state prisons are considered public entities under the ADA. Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998).

"Title II authorizes suits by private citizens for money damages against public entities that violate § 12132." Guttman v. Khalsa, 669 F.3d 1101, 1112 (10th Cir. 2012). Plaintiff's ADA claims seek damages not from a public entity, however, but from municipal employees. Plaintiff may bring claims under the ADA against a state or an individual defendant only in his or her official capacity. Defendants are not amenable to suit for violations of the ADA in their individual capacities. See Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999)("[T]he ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition."). Plaintiff concedes in his

responsive pleading that liability under the ADA is directed solely to the employer and Defendants are not liable under the ADA in their individual capacities. Consequently, Defendants Gossen, Hobbs, Nix, Williams, and Board's Motion to Dismiss Plaintiff's ADA claims in counts one and two against them in their individual capacities should be granted, and the claims in counts one and two against Defendants in their individual capacities should be dismissed for failure to state a claim upon which relief may be granted.

With respect to Plaintiff's ADA claims against the Board in their official capacities, Defendant Board seeks dismissal of the claims or, in the alternative, summary judgment. Because Defendant Board's motion to dismiss these official capacity claims relies on evidentiary materials outside of the pleadings, the motion is construed as one seeking summary judgment.

With respect to Plaintiff's ADA claims in counts one and two against the Board in their official capacities, the material, undisputed facts show that:

1. Plaintiff was booked into the CCDC on May 6, 2013.

2. During his initial booking process, Plaintiff was asked about his medical condition (as well as other topics). Plaintiff reported that he had an unhealed broken foot (calcaneous fracture), his foot had an open wound and was bandaged, and he was using crutches to ambulate.

3. Plaintiff was released from the CCDC to state prison officials on October 4, 2013. During his five-month detention at CCDC, he was housed in the medical unit due to his medical condition which prohibited him from being housed in the general population.

4. On May 7, 2013, CCDC staff obtained a medical report from Plaintiff's private physician,

Dr. Clowers. Dr. Clowers' report was dated April 29, 2013, approximately one week before Plaintiff was booked into the jail. Dr. Clowers' report revealed that Plaintiff's broken foot and unhealed wound were in severe condition. According to Dr. Clowers' report, between April 2012 and April 2013, Plaintiff had injured his foot twice, had undergone surgery on the foot twice, had an open wound on his foot which became infected, and had been in a non-weight bearing cast for the past year. Dr. Clowers noted in the report that Plaintiff had a "very difficult surgical problem with his foot;" there was no "good conservative management option" for Plaintiff; "it is important to determine if he has any ongoing evidence of infection;" and "if he contracts [a] significant infection at any point, this could turn this into a limb threatening condition."

5. Jail staff took photos of Plaintiff's injured, infected foot on May 7-8, 2013.

6. During Plaintiff's detention, he was not able to walk on his own. He required the use of crutches, and at times he had a non-weight bearing splint on his right foot. The CCDC transported Plaintiff to the Comanche County Hospital for wound care treatment and examinations on multiple occasions.

7. Plaintiff also received wound care treatment at the CCDC on many occasions.

8. The medical unit at CCDC consists of three cells, a treatment room, a pharmacy/supply room, and a waiting room. Detainees with special medical needs are housed in the medical unit. The medical unit cells can house up to two detainees in each cell. There was also an

open area outside of the cells in the medical unit that had telephones for detainee use.[1]

9.  During his detention at the CCDC, Plaintiff was housed in the medical unit at the CCDC because of his severely injured and infected foot.  Due to his injury, Plaintiff was unable to ambulate on his own without the use of crutches.  His infection required, for a period of time, daily observation and wound care by jail medical staff.  Such intensive care could only be provided if he was housed in the medical unit where the jail medical staff could observe him constantly and have immediate access to Plaintiff if medically necessary.

10.  Additionally, Plaintiff's crutches were a security concern.  If he had been housed with other detainees in a dormitory style pod, he could have used them as weapons against jail staff or other detainees, or other detainees could use them against Plaintiff.

11.  In the medical unit, Plaintiff had a hospital bed which was fully dressed in linens, a pillow, and a blanket.  Inmates in dormitory style pods have a mat, a blanket, no linens, and no pillows.

12.  Inmates in dormitory style pods had access to a television.

13.  In the medical unit, Plaintiff had a shower, sink, and toilet in his cell.  In the jail's

---

[1]Plaintiff insists in his responsive pleadings that a "dayroom" existed in the jail's medical unit "outside of the inmate cells," but Plaintiff describes this only as an area where the detainee phones were located.  Plaintiff has submitted a sworn statement from an individual, Mr. Baker, in which Mr. Baker states that he was  confined in the CCDC's medical unit on July 19, 2013, and that the medical unit contained a "dayroom," although the contents of the "dayroom" are not described.  Mr. Baker states that all of the detainees housed in the CCDC medical unit were not allowed to participate in "out of cell time." In the absence of any material facts indicating otherwise, it is assumed that Plaintiff's reference to a "dayroom" is a reference to the area described in Defendants' motion as the area outside of the detainees' cells.  See Plaintiff's Grievance dated June 12, 2013, in which he requests access to the medical unit's "pod day room and phone." Plaintiff's Response (Doc. # 29), Ex. 4.

dormitory style pod, several detainees shared a community shower, sink, and toilet.

14.  The detainee phones in the medical unit are located outside of the detainee cells in an open area where medical staff work.  For obvious security reasons, because the phones are located outside of the cells, when a detainee is out of his/her cell to use the phone, medical staff must be able to assist and observe the detainee's use of the phone and medical staff's attention has to be focused on the detainee.  Thus, the phone schedule in the medical unit is more regimented than in the dormitory style pod.  Detainees in the medical unit are allowed to use the phone at least three times per week or more if a detainee requests it and medical staff are able to assist and observe the detainee's use of the phone.  The CCDC keeps logs of certain activity which occurs with detainees housed in the medical unit.  According to Plaintiff's activity logs, Plaintiff refused to use the phone on approximately 17 different occasions between May 7, 2013 and October 3, 2013.

15.  Detainees housed in a dormitory style pod have access to phones generally on a daily basis between 6 a.m. and 10:30 p.m.  A detainee must either make a collect call or use a phone calling card.  The phones are not free.

16.  Generally, all detainees at CCDC are provided out-of-cell recreation time for one hour per day.  This recreation time is spent in the recreation room, which is open to the outdoors and has a basketball goal.  According to Plaintiff's activity logs, he refused to participate in recreation time on approximately 68 different dates between May 7, 2013 and October 3, 2013.

17.  Generally, all detainees in the CCDC are provided cleaning supplies each week to clean

their cells. Additionally, trustees clean cells once a week. Jail staff do not clean any detainee's cell for him or her.

18. On June 24, 2013, Plaintiff's private physician, Dr. Clowers, prescribed a non-weight bearing boot for Plaintiff. The jail filled this prescription and charged the cost of the boot to Plaintiff's account, per CCDC policy.

19. Plaintiff was released from the CCDC on October 4, 2013.

To establish a violation of Title II of the ADA, an individual must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. See 42 U.S.C. § 12132; Robertson v. Las Animas County Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007). Title II of the ADA incorporates § 505 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794a, which authorizes private citizens to bring suits for money damages. 42 U.S.C. §12133. However, the Supreme Court has held that Title II validly abrogates a state's sovereign immunity only "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." United States v. Georgia, 546 U.S.151, 159 (2006)(emphasis in original). Thus, in order to obtain monetary damages against Defendant Board members in their official capacities, Plaintiff must demonstrate conduct by Defendant Board members that would establish an actual violation of the Fourteenth Amendment.

Plaintiff alleges Defendant Board members violated his substantive due process and

equal protection rights by treating him differently because of his disability. The Supreme Court has concluded that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. They could quite hardheadedly - and perhaps hardheartedly - hold to job-qualification requirements which do not make allowance for the disabled." Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 367-368 (2001). See Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985)(where plaintiff is not member of suspect class or where conduct alleged does not involve fundamental right, courts require only rational relationship between differential treatment of similarly-situated individuals and a legitimate government interest).

Plaintiff's ADA claim in count one fails simply because the undisputed facts demonstrate that his differential treatment was due to his assignment to the jail's medical unit and not due to discriminatory reasons. In this case, Plaintiff was placed in the medical unit of the jail because he had a right foot injury and infection that required constant medical monitoring and treatment. There is an obvious rational relationship between his placement in the jail's medical unit and the jail's legitimate objective of providing for the safety and well-being of the detainees confined in the jail.

Plaintiff has not shown that he was denied the opportunity to participate in programs or services available at the jail because of his disability. Rather, he has shown only that the jail's medical unit did not allow detainees housed in the medical unit for valid medical reasons the same freedom of movement or unfettered access to telephones as was allowed

in the jail's non-medical housing areas. Further, the undisputed facts show that Plaintiff repeatedly refused to participate in recreation time and repeatedly refused the opportunity given him to use the medical unit's telephones. There are no material issues of fact for trial with respect to Plaintiff's ADA claim in count one, and Defendant Board is entitled to summary judgment with respect to this claim.

Moreover, with respect to Plaintiff's ADA claim in count two, the undisputed facts do not demonstrate Plaintiff was discriminated against due to his disability. Rather, Plaintiff has alleged that he was advised to clean his cell because the jail's policy was that detainees at the jail were responsible for cleaning their own cells. In his responsive pleading, Plaintiff asserts his claim in count two is that he was denied the opportunity to have a trustee clean his cell, which he needed because of his physical limitations due to his injured foot. The record reflects that Plaintiff submitted a request to staff to Defendant Nix on July 3, 2013, asking for "someone [to] be appointed to clean cell for me." Special Report (Doc. # 29), Ex. 12. Defendant Nix responded on July 9, 2013, that Plaintiff was required to keep his cell area clean and he should "[d]o what you can without hurting yourself." Id.

Plaintiff alleges his "cell became very filthy and Plaintiff contracted Athelet's [sic] feet and Jock ich [sic] fungus, and mental distress" after July 18, 2013. Plaintiff's response (Doc. # 29), at 11. However, Plaintiff's conclusory allegation is not supported by supporting documentary evidence showing that these medical conditions, if they existed, were plausibly connected with his inability to clean his cell rather than to some other cause, such as his own inadequate hygiene habits. Plaintiff alleges he fell on one occasion while trying to clean

his cell. A single instance in which he was physically unable to clean his cell does not demonstrate a material issue of fact for trial with respect to his ADA claim in count two. Defendant Board is therefore entitled to summary judgment with respect to Plaintiff's ADA claim in count two.

V. Due Process and Equal Protection Claims in Counts One and Two

To the extent Plaintiff has alleged in counts one and two that his rights under the Due Process Clause were violated because of his placement in the jail's medical unit, the undisputed facts, viewed in the light most favorable to Plaintiff, demonstrate that Defendant Board is entitled to summary judgment. State pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979). Accord, Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999)("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment."). These protections are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Mass. General Hospital, 463 U.S. 239, 244 (1983). "Although the Due Process clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims." Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998)(citation omitted).

The Eighth Amendment "imposes duties on [prison and jail] officials who must provide humane conditions of confinement; prison [and jail] officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832

15

(1994)(quoting Hudson v. Palmer, 468 U.S. 517, 526-527 (1984)). See Ramos v. Lamm, 639 F.2d 559, 568 (10th Cir. 1980)(States must provide their inmates with "reasonably adequate ventilation, sanitation, bedding, hygiene materials, and utilities (*i.e.*, hot and cold water, light, heat, and plumbing)"). The Supreme Court's opinion in Farmer provides the framework for evaluating Plaintiff's claims.

To prevail on a claim under the Eighth Amendment, an inmate must show he was "incarcerated under conditions posing a substantial risk of serious harm" and that the prison or jail officials were deliberately indifferent to the inmate's health or safety. Farmer, 511 U.S. at 834, 837. "'[D]eliberate indifference' is a stringent standard of fault." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997). Prison or jail officials cannot be found liable under this standard unless they subjectively knew of and disregarded an excessive risk to the inmate's health or safety. Farmer, 511 U.S. at 837.

With respect to medical needs, the detainee or inmate must show both that the medical needs are "serious" and that officials were deliberately indifferent to those serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 102-105 (1976). Plaintiff has alleged in counts one and two that Defendants were deliberately indifferent to his health or safety needs. The undisputed facts show the opposite. Plaintiff was provided medical treatment on multiple occasions and transported to a hospital for medical treatment on multiple occasions for his injured and infected right foot. He was allowed to use crutches, he was provided a cell with a bed, linens, a pillow, a shower, a sink, and a toilet, he was allowed some opportunities to use the telephone and participate in recreation although he often refused these privileges,

and he was monitored by medical staff.

With respect to the conditions of his confinement in the jail's medical unit, Plaintiff alleges in the Complaint that the conditions in the medical unit were similar to the conditions in the jail's disciplinary segregation unit. However, Plaintiff was not transferred from the jail's general population area to the medical unit, and his security level was never "raised" as he alleges in his responsive pleading. Plaintiff's Response (Doc. # 29), at 11. It is undisputed that Plaintiff was always confined in the CCDC medical unit until he was transferred out of the jail's custody. Thus, he cannot show that jail officials transferred him to harsher conditions that might constitute an "'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" Rezaq v. Nalley, 677 F.3d 1001, 1011 (10th Cir. 2012)(quoting Wilkinson v. Austin, 545 U.S. 209, 223 (2005)(internal quotations and citation omitted).

Moreover, even though, as Plaintiff alleges, Plaintiff was not allowed unfettered access to a "dayroom" during a substantial part of each day, as was allowed in the general population areas of the jail, the undisputed facts show that the conditions of Plaintiff's confinement in the medical unit offered him quick access to medical treatment and a cell that contained a shower, sink, and toilet, amenities that were not given to detainees in the general population area of the jail. Plaintiff's medical condition, need for medical monitoring, and use of crutches for mobility placed him in different circumstances than that of other detainees, and he has not shown that the conditions of his confinement in the medical unit created an "atypical and significant hardship" in relation to the circumstances available in

other areas of the jail. Nor has Plaintiff demonstrated a material issue of fact with regard to his equal protection claims in counts one and two. The undisputed facts show that Plaintiff had a serious medical condition that required constant medical monitoring, medications, and the use of crutches and, at some point, a non-weight bearing boot prescribed by his private physician. Under these circumstances, Plaintiff was not similarly situated to other detainees in the jail. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claims in counts one and two alleging violations of the Due Process and Equal Protection Clauses

## VI. Count Four - Dental Treatment

In count four of the Complaint, Plaintiff alleges that he was "denied emergency dental care because CCDC has a policy-custom that does not allow CCDC to provide emergency dental to thoes [sic] detainees who are indigent and cant [sic] afford up front dental cost." Complaint, at 10. In his responsive pleading, Plaintiff clarifies that in count four he is alleging Defendants Nix and Williams were deliberately indifferent to his serious medical need for emergency dental treatment. See Plaintiff's Response (Doc. # 30), at 8-9.

With respect to Plaintiff's claim in count four of deliberate indifference by Defendants Nix and Williams to his serious dental needs, the material, undisputed facts are as follows:

1. According to Plaintiff, he first submitted a request for dental treatment on August 13, 2013, and on additional dates thereafter.

2. In response to Plaintiff's request, Plaintiff was seen on August 13, 2013, by CCDC's physician's assistant, Mr. Williams, who prescribed him prescription strength Ibuprofen.

3.  Plaintiff was again seen by Mr. Williams on August 27, 2013, for dental treatment.  At this time, he was examined and prescribed antibiotic medication, Clindamycin.

4.  Plaintiff was again seen by Mr. Williams on October 1, 2013, for tooth decay.[2]

5. Plaintiff was released from the CCDC on October 4, 2013.

In Farmer, 511 U.S. at 828, the Supreme Court reiterated that a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  With respect to the issue of medical care, the Eighth Amendment is violated if prison officials show "deliberate indifference to an inmate's serious medical needs." Mata v. Saiz 427 F.3d 745, 751 (10th Cir. 2005).

> The test for a "deliberate indifference" claim under the Eighth Amendment has both an objective and a subjective component. The objective component of the test is met if the harm suffered is sufficiently serious to implicate the Cruel and Unusual Punishment Clause.  The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

Kikumura v. Osagie, 461 F.3d 1269, 1291 (10th Cir. 2006)(quotations and citations omitted).

"To succeed on an Eighth Amendment claim, . . . , a plaintiff is required to identify 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Callahan v. Poppell, 471 F.3d 1155, 1160 (10th Cir. 2006)(quoting Estelle v.

---

[2]Although in his unsworn responsive pleadings Plaintiff denies that he was treated by Mr. Williams on October 1, 2013, Defendants have presented documentary evidence in the form of a progress note indicating Plaintiff was indeed treated by Mr. Williams on October 1, 2013, for tooth decay and dry skin. Special Report, Ex. 17.   Plaintiff has not satisfied the requirements of Fed. R. Civ. P. 56 for disputing the Defendants' documentary evidence presented in support of their Motion for Summary Judgment.

Gamble, 429 U.S. 97, 106 (1976)). There are two types of conduct that may constitute deliberate indifference to a serious medical need. "First, a medical professional may fail to treat a serious medical condition properly." Sealock v. Colo., 218 F.3d 1205, 1211 (10th Cir. 2000). Second, a prison official may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." Id.

Plaintiff alleges in count four that Defendants Nix and Williams were deliberately indifferent to his serious medical needs because they refused to allow him to be evaluated by a dentist for treatment of his "problematic teeth." See Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000)("If ... the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.").

The undisputed medical records contained in the Special Report reflect that Defendant Williams authored a progress note dated August 13, 2013, indicating Plaintiff sought treatment for "new symptoms" of dental pain occurring for "several days." Treatment was prescribed, including prescription-strength pain medication. On August 27, 2013, Plaintiff saw Defendant Williams and requested treatment by a "dentist." Dr. Williams examined Plaintiff's teeth and found that one tooth was cracked and two teeth were decayed. Dr. Williams noted on the Progress Note that Plaintiff exhibited mild erythema and swelling in his mouth and very poor dentition. He was prescribed antibiotic medication and again

prescribed prescription-strength pain medication.

In response to Plaintiff's request to staff directed to Defendant Nix on September 15, 2013, that he needed to see a dentist, Defendant Nix advised Plaintiff that such a dental appointment could be scheduled "but they only x-ray and pull. And the cost will be added to your bill. Is this what you want to do?"  Plaintiff submitted another request to staff to Defendant Nix the following day stating that he did want to see a dentist. Defendant Nix responded that Plaintiff should first see the physician's assistant at the jail, Defendant Williams, to check for infection.  Plaintiff was treated again by Defendant Williams on October 1, 2013.  Defendant Williams' Progress Note for this visit indicates Plaintiff had dental decay and dental caries as well as dry skin.  Treatment for these conditions was noted, although the exact nature of the treatment rendered to Plaintiff is illegible.  Plaintiff was transported to state custody three days later.

The undisputed facts reflect that Plaintiff was treated multiple times for his dental infection and dental pain and that medications, including pain and antibiotic medications, were prescribed.  Plaintiff's request for further treatment by a dentist appears to be related to his cavities and tooth decay rather than to an infection, which was treated by Defendant Williams.  Nothing in the Progress Notes of treatment of Plaintiff in August and October indicates that Plaintiff's teeth required emergency dental treatment beyond that provided by Defendant Williams, and the undisputed facts demonstrate that Defendants Nix and Williams were not deliberately indifferent to Plaintiff's need for dental treatment.  Thus, Defendants Nix and Williams' Motion for Summary Judgment with respect to Plaintiff's claim in count

four should be granted.

<u>RECOMMENDATION</u>

Based on the foregoing findings, it is recommended that Defendants' Motion to Dismiss Plaintiff's claims under the ADA in counts one and two against them in their individual capacities be GRANTED, that Defendant Board's Motion for Summary Judgment with respect to Plaintiff's claims under the ADA in counts one and two against Board members in their official capacities be GRANTED, that Defendants' Motion for Summary Judgment with respect to Plaintiff's claims against them in counts one and two alleging due process and equal protection violations be GRANTED, and that Defendants Nix and Williams' Motion for Summary Judgment with respect to Plaintiff's claim against them in count four be GRANTED. As previously set out herein, Plaintiff's request to dismiss count three is GRANTED.

The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court by _____October 14th_, 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991); <u>cf.</u> <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned

Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this __22nd__ day of ___September___, 2014.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE